1   BARRACK, RODOS & BACINE
    STEPHEN R. BASSER (121590)
2   SAMUEL M. WARD (216562)
    600 West Broadway, Suite 900
3   San Diego, CA 92101
    Telephone: (619) 230-0800
4   Facsimile: (619) 230-1874

5   RICHARD L. CREIGHTON, JR.
    WILLIAM A. POSEY
6   W. JEFFREY SEFTON
    KEATING MUETHING & KLEKAMP PLL
7   One East Fourth Street
    Suite 1400
8   Cincinnati, Ohio 45202
    Telephone: (513) 579-6400
9   Facsimile: (513) 579-6457

10  Attorneys for Plaintiffs Patricia C. Reiter, Christopher J. Reiter and James A.
11  Singler, as Successor Trustee of the Jack L. Reiter and Patricia C. Reiter
    Irrevocable Trust, U/A/D April 27, 2000

12              UNITED STATES DISTRICT COURT
13            CENTRAL DISTRICT OF CALIFORNIA
                   SOUTHERN DIVISION
14
15  PATRICIA C. REITER an individual    )   CASE NO. *SACV09-811 AG(RNBx)*
    and CHRISTOPHER J. REITER and       )
16  JAMES A. SINGLER, as Successor      )   **COMPLAINT FOR:**
    Trustee of the Jack L. Reiter and   )
17  Patricia C. Reiter Irrevocable Trust,)  1. Violations of the Racketeer
    U/A/D August 27, 2000,              )      Influenced and Corrupt
18                                       )      Organizations Act, 18. U. S. C. §
                  Plaintiffs,           )      1962(a)-(d);
19                                       )   2. Violation of California of
         V.                             )      Business and Professions Code §
20                                       )      17200 *et. seq;*
    MUTUAL CREDIT CORPORATION,          )   3. Breach of Fiduciary Duty;
21  SPURLING GROUP, LLC ,               )   4. Aiding and Abetting Breach of
    SPURLING GROUP II, LLC,             )      Fiduciary Duty;
22  MICHAEL BROWN, ANTHONY              )   5. Fraudulent Concealment, Cal.
    JACOBSON, DAVID DOTEN,              )      Civ. Code. § 1710, *et.seq;*
23  RUMSON CAPTIAL, L.P.,               )   6. Unjust Enrichment Restitution
    NATIONAL WEALTH ADVISORS,           )      and Imposition of a Constructive
24  RICHARD L. SWOPE, SWOPE             )      Trust;
    LAMBERSON, P.A., TODD               )   7. Fraudulent
25  SHELBAUGH and DOES 1 through        )      Inducement/Misrepresentations/
    100,                                )      Common Law Fraud
26                                       )   8. For Damages Under Florida Law
                  Defendants.           )      Re: Usury
27                                       )
                                         )   **JURY TRIAL DEMANDED**
28                                       )

RICO COMPLAINT

Plaintiffs Patricia C. Reiter ("Mrs. Reiter"), Christopher J. Reiter ("Christopher Reiter") and James A. Singler, as Successor Trustee of the Jack L. Reiter and Patricia C. Reiter Irrevocable Trust U/A/D April 27, 2000 (the "2000 Trust") allege, upon information and belief, as follows:

## NATURE OF THE ACTION

1.     This is an action for, *inter alia*, damages, restitution, disgorgement and injunctive relief arising from a deceptive and predatory life insurance premium financing and investment transaction and scheme implemented by the defendants that preys upon seniors.  In this case, the harm fell to plaintiff Mrs Reiter, who is now 82 years old and her intended beneficiaries, her son, Christopher Reiter and the beneficiaries of the 2000 Trust.  Pursuant to their scheme, defendants made enormous profits from the acquisition and sale of Mrs. Reiter's valuable insurable interest, exploiting her in the process.  The defendants perpetrated this scheme upon not only Mrs. Reiter, but upon many other seniors, utilizing unfair and deceptive practices, including the calculation and imposition of unconscionable, intentionally coercive "contingent interest" financing obligations after inducing her to enter transactional contracts of adhesion by misrepresenting and/or concealing material information.

2.     Non-recourse premium financed life insurance policies, when structured and used properly, may serve legitimate financial and estate planning purposes for seniors and their families.  However, the defendants, a group of financiers, insurance agents, brokers and predatory investors associating themselves for a common unfair and deceptive purpose, acted not to provide a legitimate financial and estate planning tool for Mrs. Reiter, but to effectively manipulate her, as they did other seniors, out of realizing the true value of her insurable interest on her life, or otherwise fairly securing and conferring such valuable benefits on her intended beneficiary, her son, plaintiff Christopher Reiter.

1

3.    Pursuant to their predatory scheme, the defendants induced Mrs. Reiter to establish the Patricia Reiter Irrevocable Insurance Trust U/A/D May 6, 2005 (the "Reiter Trust"), an irrevocable trust established under the laws of California and, in coordination therewith, induced Mrs. Reiter to execute complex form documents and contracts of adhesion.    One of the scheme participants, defendant David Doten ("Doten"), was designated the Administrative Trustee of the 2005 Reiter Trust (the "Administrative Trustee").    Another defendant, Richard Swope ("Swope"), was designated as the Investment Trustee of the Reiter Trust (the "Investment Trustee").

4.    In exchange for participating in the defendant's scheme, Mrs. Reiter was promised Two Hundred and Seventy Thousand Dollars ($270,000).    Mrs. Reiter never received such a payment.

5.    The Administrative Trustee and the Investment Trustee of the 2005 Trust then purchased a certain life insurance policy on the life of Mrs. Reiter from Jefferson Pilot Life Insurance Co., policy number JP5516872, with a death benefit of Nine Million Dollars ($9,000,000) (the "Jefferson Pilot Policy.").    Defendants Todd Shelbaugh ("Shelbaugh") and/or National Wealth Advisors, Inc. ("National Wealth") and/or Rumson Capital L.P. ("Rumson Capital") served as brokers during the sale of the Jefferson Pilot Policy to the Reiter Trust

6.    The Administrative Trustee and the Investment Trustee then borrowed Five Hundred and Sixty Three Thousand Eight Hundred Dollars ($563,800) (the "Initial Loan") from defendant Mutual Credit Corporation ("MCC").    The Initial Loan was obtained under very unfavorable financing terms, secured by the Jefferson Pilot Policy.    The Initial Loan was a balloon note, which provided for payment of all principal and interest on July 25, 2007.    The loan was so unfavorable that the "contingent interest" charged to the 2005 Trust was in excess of One Hundred Percent (100%).    Such "contingent interest" was designed to encourage forfeiture of the Jefferson Pilot Policy to MCC at the end of the two (2)

2

year contestability period, which ended in July of 2007. The contestability period is the time period during which an insurance company may contest the validity of a life insurance policy. The contingent interest valuation, set forth in the loan documents, calls for a complex valuation of the contingent interest, but the financier, MCC, never intended to accept a valuation that would result in a modest or fair "contingent interest" and, instead, unfairly manipulated, as was its custom and practice, the so-called valuation practice so that the contingent interest component was as high as possible, hence effectively precluding Mrs. Reiter from being able to repay the loan before the maturity date or otherwise maintain ownership of the policy sufficiently long enough to realize the economic value, for herself or her son, Christopher Reiter, of one of her most valuable "assets," the insurable interest on her life.

7.    The proceeds of the Initial Loan were sufficient to cover the Jefferson Pilot Policy premiums for 2 years, as well as provided an additional One Hundred and Eighty Thousand Dollars ($180,000) to the Trust, in cash.

8.    One Hundred and Forty Thousand Dollars ($140,000) was withdrawn from the 2005 Trust brokerage account on September 1, 2005, but both the Administrative Trustee and the Investment Trustee fail to account for this trust distribution.

9.    Shortly before July of 2007, Mrs. Reiter had a stroke and during that time was administered medication to which she was allergic. The stroke and the allergic reaction placed Mrs. Reiter on her death bed, thus making the Jefferson Pilot Policy all the more valuable.

10.    After Investment Trustee Richard Swope, broker Todd Shelbaugh and/or National Wealth and/or Rumson Capital learned of Mrs. Reiter's illness they sought to sell the Jefferson Pilot Policy from the 2005 Trust to a third party through a process known as a "life settlement." Both defendant Shelbaugh and defendant Swope failed to obtain the consent of Mrs. Reiter and her son,

3

Christopher Reiter, to sell the Jefferson Pilot Policy.  Neither Mrs. Reiter nor Christopher Reiter had knowledge of the sale of the policy until after the transaction was complete.

11.   In order to effectuate the sale of the policy to a third party, defendants Swope and Shelbaugh had to produce the Jefferson Pilot Policy free and clear from any encumbrances.  In order to do so, defendants Swope and Shelbaugh then obtained a personal loan (guaranteed by defendants Swope and Shelbaugh) (the "Bridge Loan") to pay off the Initial Loan.

12.   Defendants used the proceeds from the Bridge Loan to payoff the Initial Loan.  Free of encumbrances, the defendants sold the Jefferson Pilot Policy to Peachtree Life Settlement for a sum equal to Two Million Seven Hundred Thousand Dollars ($2,700,000).  Fraudulently, defendants reported to Christopher Reiter, the beneficiary of the 2005 Trust, and the Internal Revenue Service that the sale price of the policy was One Million Nine Hundred Eighty Thousand Dollars ($1,980,000).  Both the Administrative Trustee and the Investment Trustee failed to accurately account for the proceeds from the sale of the Jefferson Pilot Policy.

13.   Defendants Swope, Shelbaugh and others profited handsomely from their scheme, in the collective amount of over $990,000, while a complete stranger to the Reiter family and predatory investor holds the rights to receive the proceeds of a $9,000,000 policy, eagerly waiting for Mrs. Reiter to die.  Mrs. Reiter's son and intended beneficiary, plaintiff Christopher Reiter, received nothing of value other than a tax bill, resulting in a loss to Christopher Reiter of $31,334.  As a firefighter, this is almost as much as Christopher Reiter makes in one year.  Interestingly, once defendant Swope learned of the loss reportable to Christopher Reiter, defendant Swope gave Christopher Reiter a check in the amount of eighty thousand dollars ($80,000) drawn on the operating account of Swope's accounting firm, Swope, Lamberson and Charbbonneau, P.A.  Defendant

4

Swope provided no explanation to Chris Reiter as to why he was entitled to this money, other than it was meant to "cover" the tax bill.

14.    The defendants' scheme, including its deployment of unconscionable interest and fee assessments, omissions of material information, violations of their fiduciary duty and fraudulent evaluation practices designed to induce and coerce Mrs. Reiter — as they do to other elderly victims — to assign her valuable insurable life insurance asset without fair and adequate remuneration, constitutes a violation of federal and state law, including the Federal Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C § 1961, *et. seg.,* California Elder Abuse and Consumer Protections Statutes, California Welfare Institutions § 15600, *et. seg.,* and California Business and Professions § 17200, *et. seg.*  Their action also constitutes fraud and breach of fiduciary duty by which defendants were unjustly enriched, thereby warranting disgorgement and the imposition of a constructive trust.

15.    In addition, this action seeks to put an end to the defendants' unfair and deceptive conduct and scheme, remedy the injuries inflicted upon their elderly victims and their beneficiaries, and stop other potential predatory lenders, financiers and investors from engaging in similar unfair and deceptive conduct in the future.

## PARTIES

**Plaintiffs**

16.    Mrs. Reiter, a citizen of the Commonwealth of Kentucky, is a widow who is currently 82 years of age.

17.    At the insistence of defendant MCC and other members of the RICO Enterprise, as alleged more fully below, plaintiff Mrs. Reiter established the Reiter Trust.  As originally created and constituted, the Trustee appointed to act for and on behalf of the Reiter Trust, was the Administrative Trustee and the Investment Trustee, each of whom are defendants herein.  On January 1, 2007, by

RICO COMPLAINT

operation of the Reiter Trust documents, that trust ceased to exist and all rights of the Reiter Trust thereby reverted to Christopher Reiter and James A. Singler, as Successor Trustee of the 2000 Trust. The 2000 Trust was established under the laws of the State of Florida.

18. Plaintiff Christopher Reiter is and has been at all times a material beneficiary of the Reiter Trust and the intended beneficiary of his mother and plaintiff, Mrs. Reiter. Christopher Reiter is and has been at all times material to this action a citizen of the State of Ohio.

**Defendants**

19. MCC is a corporation organized and existing under the laws of the State of California with its principal place of business in Irvine, California. MCC and its investors and officers named herein, created the unfair and deceptive scheme that exploited Mrs. Reiter to the detriment of the plaintiffs, and, along with the other defendants, profited from the sale or assignment of the rights to the proceeds of the life insurance policy on Mrs. Reiter's life to a ready market of investors.

20. Defendant Spurling Group, LLC ("Spurling") is a limited liability corporation organized and existing under the laws of the State of Delaware with its principal place of business in Irvine, California. Spurling is not presently listed on the California Secretary of State's website as a company registered to do business in California. Spurling was established by the principals of Sierra Life Solutions, LLC, a California insurance broker ("Sierra") and that Spurling's original interest holders included XE Capital Management, LLC ("XE Capital") and Arche Master Fund, LLC ("Arche") which at all relevant times was dominated and controlled by XE Capital. Plaintiffs are further informed and believe that XE Capital and Arche helped implement the MCC financing program and had the authority to approve each transaction that Spurling funded. Plaintiffs are further informed and believe that KBC Financial Products UK Ltd. ("KBC") currently

6

THIS IS A HEADER

1  owns MCC and certain of its servicing assets and Spurling or certain of its assets

2  and/or interests.

3    21.    Defendant Spurling Group II, LLC ("Spurling II") is a limited liability

4  corporation organized and existing under the laws of the State of Delaware with

5  its principal place of business in the State of Wisconsin.

6    22.    Defendant Swope is a Certified Public Accountant and an insurance

7  agent licensed by the State of Florida, and a citizen resident of the State of

8  Florida.

9    23.    Defendant Swope Lamberson, P.A. (as successor to Swope,

10  Lamberson and Charbbonneau P.A.) is a Professional Association organized

11  under the laws of the State of Florida with its principal place of business in

12  Naples, Collier County, Florida.

13    24.    Defendant Michael Brown ("Brown"), an individual, is a citizen and

14  resident of the State of California and a licensed insurance agent whose principal

15  place of business is in Orange County, California.   At all relevant times,

16  Defendant Brown was an officer or employee of MCC and/or Spurling and acted

17  as a life insurance agent with respect to Jefferson Pilot Policy.  Brown is also a

18  principal of Sierra whose investment equity in Spurling was used to fund the

19  MCC premium loan program.

20    25.    Defendant Anthony Jacobson ("Jacobson"), an individual, is a citizen

21  and resident of the State of California, and a licensed insurance agent whose

22  principal place of business is in Orange County, California.  At all relevant times,

23  Defendant Jacobson was an officer or employee of MCC and/or Spurling.

24  Plaintiffs are informed and believe that Defendant Jacobson had a commission

25  sharing agreement with Defendant Brown, which included the sharing of a

26  commission on the life insurance policy that the Reiter Trust purchased.  Plaintiffs

27  further allege upon information and belief that Defendants Brown, Jacobson,

28  Swope and Swope Lamberson, P.A., had a commission sharing agreement which

7

included the sharing of a commission on the life insurance policy that the Reiter Trust purchased.

26.    Defendant Doten, an individual, is a citizen and resident of the State of California, and a California licensed insurance agent whose principal place of business is in California.

27.    Defendant Shelbaugh, an individual, is a citizen and resident of the State of Florida and a licensed insurance agent doing business in the State of Florida.  At all relevant times, Shelbaugh was associated with defendants National Wealth and/or Rumson Capital and acted as the broker of record with respect to the Jefferson Pilot Policy.

28.    Defendant National Wealth is a corporation organized under the laws of the State of Florida with its principal place of business in the State of Florida. National Wealth is in the business of brokering life insurance through its life insurance agents.

29.    Pursuant to California Insurance Code § 785, all insurers, brokers, agents and others engaged in the transaction of insurance owe a perspective insured who is 65 years of age or older, a duty of honesty, good faith and fair dealing.  This duty is in addition to any other duty, whether expressed or implied that may exist.  Each of the defendants named above in paragraphs 16 through 28, owed such duties to Mrs. Reiter who was over 78 years of age at the time of the insurance transactions alleged herein.

**Predatory Investor Defendants**

30.    Defendant Rumson Capital  is a limited liability partnership organized and existing under the laws of and with its principal place of business in the Commonwealth of Pennsylvania.  Plaintiffs are informed and believe that Rumson Capital brokered the sale of insurance policy benefits with respect to the insurance policy that was issued to the Reiter Trust to third party investors.  Rumson Capital has and continues to assist or otherwise facilitate sales by MCC and/or Spurling of

8

elderly victims' life insurance policy proceeds to individuals and entities who purchase the rights to such policy proceeds upon the death of the victimized trustor, such as Mrs. Reiter, at substantial discounts, in the hope that such victims will suffer as early as demise as possible, thereby enabling such investors to reap substantial, windfall profits and achieve enormous returns on their investments.

31. The investors who speculate in such policies secured through the scheme and enterprise alleged herein, gambling that its innocent victims will die sooner, rather than later, and entities that locate or facilitate such investors, are collectively referred to herein as the "Predatory Investors." Predatory Investors that acquired rights to Mrs. Reiter's policy with knowledge of or participation in the RICO Enterprise, including any assistance or association in fact in such conduct for a common purpose, are also encompassed by the moniker "RICO Enterprise Entity."

32. The true names and capacity's, whether individual, corporate, associate or otherwise, of Defendant Does 1-100, inclusive, are unknown to Plaintiffs at this time and therefore plaintiffs sue said Defendants by such fictitious names, and reserve the right to move for leave to amend this complaint when the true names of each such Defendant are ascertained. Defendants sued herein as Does 1-100, are presently unknown and could include major distributors and financial institutions in the insurance and life settlement industries or other members of the RICO Enterprise Entity and participants in the RICO Enterprise. Each of these unknown Defendants are responsible in some manner for the events and happenings referred to herein and proximately caused injuries and damage to the plaintiffs as alleged herein.

33. Each of the Defendants named herein in Paragraphs 16 through 32 are also collectively referred to herein and constitute the "RICO Defendants." Each of the RICO Defendants is a member, associate or part of the "RICO Enterprise" and a participant in the RICO scheme, as more fully alleged herein.

9

## JURISDICTION AND VENUE

34.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1381 and 18 U.S. C. § 1965 with respect to claims made under 18 U.S.C. §§ 1962 and 1964 more generally referred to as RICO (Racketeering Influenced and Corrupt Organizations Act.

35.   This Court has personal jurisdiction over all of the defendants because they maintain their domicile of residence in, or otherwise incorporated in or have their principal place of business in the State of California and/or because they conduct business in the State of California, or otherwise are a member of the RICO Enterprise, headed by defendants MCC and Spurling, created in and operated out of or from the State of California with respect to a substantial part of the RICO Enterprise, at all time material.

36.   This Court also has supplemental jurisdiction of all State law related claims pled in this action pursuant to 28 U.S.C. § 1367.

37.   Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to plaintiffs claims occurred in this District, and/or various defendants reside in this District or otherwise have their place of business in this District.

38.   Venue in the Central District of California is also proper pursuant to 18 U.S.C. § 1965 because defendants availed themselves of the privilege of transacting business in and/or have agents in this District.

## GENERAL ALLEGATIONS

### Life Insurance and the Insurable Interest Rule

39.   Life insurance is intended to protect the insured individual's family or other persons or entities who have a financial interest in common with the insured (*e.g.,* business partners) in the event that the insured individual dies.  In most instances, the policy owner is also the insured individual, and he or she may designate one or more beneficiaries, such as family members or a trust, to receive

10

the death benefits in the event that he or she dies while the policy is in effect. The policy owner pays a premium, usually on a periodic basis (*e.g.*, yearly), to secure the policy and corresponding benefits.

40.    Life insurance can serve as a useful estate planning tool that allows decedents to provide for their loved ones after their death. Since premiums on such policies can be considerable, insureds may utilize various financing arrangements, such as nonrecourse premium financing, to pay the premiums on the policies for the benefit of their intended beneficiaries. In such arrangements, a lender typically provides the borrower with commercially reasonable loan terms, including a commercially reasonable rate of interest on the loan. The loan is often secured by assets other than the policy itself.

41.    However, as more fully discussed herein, the defendants intentionally constructed a predatory insurance premium financing and investment practice and Scheme that exploits the elderly, enabling themselves to profit handsomely while, ironically — as in the case of Mrs. Reiter — the very elder whose life is insured and had real economic value is left with comparatively very little.

## MCC's Predatory Life Insurance Premium Financing and Investment Scheme Targeting Senior Citizens

42.    MCC provides nonrecourse loans to fund the purchase of life insurance policies. The security for such a loan is the policy itself. However, MCC's intent and practice is to structure and operate its premium financing program to coerce elderly borrowers into assigning away their valuable insurable interest for far less than its market value. In accordance with the defendants Scheme, MCC intends from the program's inception to cause the accrual of exorbitant interest, leaving the borrower with no viable option other than to relinquish the policy to MCC to discharge the enormous interest debt and enable MCC and defendants who are participants in the Scheme to reap enormous profits, either by retaining the rights

11

to the policy or selling those rights on a ready, secondary market of predatory and other investors.

43.   These "stranger" investors engage in highly-profitable speculation by purchasing the rights to the elderly victims policy gambling that he or she will die sooner than predicted by the actuarial tables, and, should this occur, enjoy a return far exceeding their investment in the premiums paid.  The "stranger" investor who owns the policy has no real relationship to the insured individual and has no interest in protecting the insured individual's family or financial interests.

44.   In the course of implementing and repeatedly carrying out their unfair and deceptive business practices and unlawful Scheme, the defendants intentionally targeted senior citizens possessing a substantial net worth, especially those living in geographic regions that are highly populated by the elderly such as Florida and California.  Senior citizens — persons of 65 years of age or older — and especially those nearing the end of their actuarial life spans, are viewed by the defendants as valuable commodities or resources who can be preyed upon because their very mortality and the ability to acquire life insurance on their lives has significant value.

45.   Defendants prey upon such senior citizens via a network of accountants, insurance agents and fiduciaries — all of whom became and were willing participants or co-conspirators in the defendants effort to reap substantial financial benefits, including robust fees and commissions, by obtaining insurance policies on the lives of persons respecting whom they had no insurable interest.

46.   The defendants use complex form contracts, loan documents and other form documents to effectuate their goals of exploiting Mrs. Reiter and other elderly victims of unequal bargaining power and comparative lack of sophistication, for their own financial benefit.  These standardized documents or forms, include an "Agreement and Declaration of Trust" (the "Trust Agreement") a "Secured NonRecourse Promissory Note," a "Consent and Acknowledgement

12

Agreement," and a consequent "Assignment of Life Insurance Policy" ("Assignment"), along with other associated financing documents.

47.   As a result of the purported nature of the transaction, the victims of the Scheme not only are charged exorbitant interest and fees and lose possession of the policies, for a relative pittance, but they often also suffer substantial adverse tax consequences based upon the defendants' characterization of the transaction for tax purposes, which was, in every instance, intended to provide MCC and the defendants with the greatest basis and/or other tax attributes possible in the transaction.

48.   This is generally how the transaction works:   MCC initially lends money for the purchase of a life insurance policy to an irrevocable life insurance trust required to be created by the senior insured or the senior insured's relatives. The loan amount is comprised of funds equal to the policy premiums for the first two years, an origination fee of five percent of the total loan, and a "premium reserve account" equal to one to three percent of the face amount of the applicable life insurance policy. The so-called "premium reserve account" can be managed by the new trust or distributed to trust beneficiaries. The loan is secured by the policy itself, and a collateral assignment in favor of MCC is executed and filed with the insurance company as evidence of that security interest.

49.   MCC charges very high rates of interest for its financing, including a five percent origination fee, which is added to the principal, a ten percent fixed interest per annum on the principal loan amount and a "contingent interest" as high as ten percent of the face value of the life insurance policy.  The contingent interest amount is calculated as the lesser of (i) $900,000 and (ii) the amount, if any, by which the "fair market value" of the Policy as of the maturity date of the loan exceeds the outstanding principal and accrued interest under the note.  The nonrecourse promissory notes are due and payable in two years.  As part of its Scheme, MCC devises a financing program in which the potential "contingent

13

interest" charged on a two-year loan could be much greater than 100 percent of the principal loan amount.

50.    After the two-year maturity date, the trust's indebtedness, including any fixed interest and contingent interest, then bears an additional default interest of 15 percent per annum. The borrower-trust has the option of repaying the promissory note with fixed interest and "contingent interest" prior to the notes maturity date.    But an exorbitant "contingent interest" assessment makes it prohibitively expensive to repay MCC's loan and maintain ownership of the policy, thus forcing the trust to relinquish the valuable life insurance policy to MCC in satisfaction of the debt.   This exorbitant "contingent interest" assessment is accomplished by MCC's "valuation" procedure that facilitates the predatory financing scheme.

51.    The MCC loan documents provide that the contingent interest could be zero if the "fair market" value of the life insurance policy is equal to or less than the principal loan amount plus the fixed ten percent interest; however, practically speaking, the valuation of zero would never occur. The promissory note sets forth a specific procedure for determining the "fair market value" of the policies.   The valuation procedure involves the use of "life settlement" providers. "Life settlements" are a financial option for owners of life insurance policies to sell their life insurance policies on the open market.   Rather than surrender the policy to the life insurance carrier for the policy's cash surrender value (if any), policy owners are sometimes eligible to sell their policy to third-party life settlement providers which might offer to purchase policies for amounts that materially exceed the cash surrender value.   In the life settlement industry, a "life settlement provider" is an entity that purchases policies from policy owners.

52.    MCC's contract instructs a trust to obtain at least two purchase bids from licensed life settlement providers. In the event the trust and MCC do not agree that the higher of the purchase bids provides a true indication of value, the

14

loan documents require the trust to obtain an "independent third-party valuation" from a specified independent company that is in the business of life settlements and related businesses (referred to herein as the "Independent Valuator") to establish the value for the policy. The Independent Valuator also is a licensed life settlement provider. The Independent Valuator's valuation sets the "fair market value" of the policies for determining the contingent interest amount.

53.  MCC, however, will only accept valuations that would result in the greatest contingent interest amount. Even when a trust follows the procedure MCC dictates in its own contracts of adhesion, MCC has refused to accept valuations from the Independent Valuator that would result in a contingent interest less than the full ten percent of face value. Instead, MCC attempts to manipulate the valuation process.

54.  MCC manipulates the valuation process to ensure that the "contingent interest" component is so substantial that a borrower-trust does not have the ability or the economic incentive to repay the loan and instead relinquishes the policy to MCC to satisfy the debt. Once MCC obtains complete ownership of the policy, it will continue to pay premiums on the policy and collect the death benefits when the insured dies, or it can sell the policy to other strangers — predatory investors — on the secondary market through a life settlement.

55.  The entire Scheme is designed and intended to be operated from its inception, in an egregious fashion, in a premeditated attempt to defraud and exploit elders and secure their valuable insured interests on their lives for a pittance.

56.  As a result, the victims of the Scheme did not fairly or meaningfully share in the benefits of these subsequent transactions, instead being deprived of the pecuniary or other gain on these transactions to which they were entitled as a result of the defendants' unfair and deceptive practices.

15

57.   The defendants took substantial efforts to conceal their wrongdoing from the victims, thereby establishing and perpetuating their Scheme.  To that end, the trusts that were formed were merely a subterfuge, under the control and dominion of MCC, its agents, and co-conspirators, used to effect the Scheme and to conceal it from its victims.

58.   Moreover, the defendants did not share with and concealed from its victims the true intent, practice and details of the Scheme, including the nature of the interest purportedly charged, the gain recognized on the sale of or associated with the insurance policy or policies, the exorbitant commissions associated with the sale and/or disposition of the policies, and other similar benefits that the defendants enjoyed and of which they deprived their victims, or how their premium financing program differed from *bona fide* nonrecourse premium financing programs, instead representing and marketing them as having similar benefits to the victims as such *bona fide* programs.

**The Defendants Commission Of The Scheme Against The Named Plaintiffs**

59.   Upon information and belief, in late 2004 and 2005, Brown and Jacobson, sometimes accompanied by other MCC employees, traveled to Florida and met in Florida with life insurance agents, including, upon information and belief, Defendants National Wealth Advisors Swope and Shelbaugh, to solicit their participation and conspiracy in MCC's Scheme to sell life insurance policies to wealthy elderly Florida victims and acquire those policies and/or the profits associated therewith using MCC's premium financing Scheme.

60.   Defendant Swope had been a long-trusted advisor to the Reiter family, having advised Mr. Jack L. Reiter, Mrs. Reiter's deceased husband and Christopher Reiter's father, for years on business and personal financial matters. In fact, Mr. and Mrs. Reiter selected him as the trustee of the 2000 Trust, and both Mrs. Reiter and Christopher continued to rely upon him to provide guidance,

16

management, and advice in many crucial areas, including investments, insurance, and tax planning and compliance.

61. As a result, Swope acted as a fiduciary to the plaintiffs at all times material to this Complaint, and he therefore owed the plaintiffs all of the corresponding nondischargeable and nondelegable duties and obligations, including the duties of disclosure and loyalty, before, during, and after the commission of the Scheme, and the plaintiffs relied upon him to do so.

62. Swope, through interactions with the other Defendants, including, but not limited to, Doten and Shelbaugh, identified the plaintiffs as potential victims of this Scheme, given Mrs. Reiter's substantial net worth and advanced age, and her and Christopher Reiter's reliance upon and trust in Swope to professionally, responsibly, and ethically manage her financial affairs and insurance.

63. On or about April and/or May 2005, Swope, one or more representatives of National Wealth Advisors, and/or Shelbaugh met with Mrs. Reiter in Osprey, Florida, and pursuant to the Scheme, discussed selling her a life insurance policy that would be financed with MCC's premium financing pursuant to the Scheme.

64. Based upon the defendants' formulaic and fraudulent representations and concealment, as detailed in and established by the Scheme, Mrs. Reiter, in exchange for Two Hundred and Seventy Thousand Dollars ($270,000), which was never received, ultimately agreed to allow the Administrative Trustee and the Investment Trustee to purchase a life insurance policy on her life, with a death benefit of $9,000,000.

65. The Defendants obtained certain information from Plaintiff, including the name and address of Christopher Reiter, whom she wished to be the beneficiary of her insurance policy, which was then forwarded to MCC, pursuant to the Scheme.

66.   Pursuant to the Scheme, Swope presented Mrs. Reiter the form "Agreement and Declaration of Trust" drafted by the MCC defendants purporting to create the "Reiter Trust" (sometimes hereinafter the "Reiter Trust Declaration"). It purports to create the Reiter Trust for the benefit of Christopher Reiter.

67.   The Reiter Trust further provides that any property remaining therein at the termination of the trust will be distributed to the Trustees of the 2000 Trust, a party plaintiff in this action.

68.   Pursuant to the Scheme, the Reiter Trust Declaration named defendant Doten as the Administrative Trustee of the Reiter Trust.

69.   Pursuant to the Scheme, Mrs. Reiter and Doten, as the Administrative Trustee, submitted an application for life insurance.

70.   Defendant Shelbaugh was identified as the insurance agent for the sale of this policy, acting as a co-conspirator in the Scheme.

71.   Pursuant to the Scheme, the Reiter Trust Declaration named Swope as the Investment Trustee of the Reiter Trust.

72.   Pursuant to the Scheme, Swope, purportedly acting as the Investment Trustee, determined that it was "in the best interest of the trust beneficiaries of the [Reiter] Trust" to use MCC's premium financing to purchase the policy on Mrs. Reiter's life, and he utilized a form letter to communicate the same to Doten.

73.   Jefferson Pilot Life Insurance Company issued a policy to Mrs. Reiter (policy number JP-5516872) in the amount of $9,000,000.

74.   Upon information and belief, Shelbaugh and/or Swope and/or one or more other defendants received the commission paid by the insurer that issued the Jefferson Pilot Policy.

75.   Pursuant to the Scheme, on or about July 26, 2005, Doten, acting as the Administrative Trustee of the Reiter Trust, executed the form loan documents previously described, including the form Promissory Note for $563,800 (the

18

"Reiter Note"), as well as the form "Assignment of Life Insurance Policy" that purported to assign all rights associated with the Jefferson Pilot Policy to MCC.

76.    Pursuant to the Scheme, the Reiter Note required payment of fixed interest on the loan amount equal to 10% per annum, an origination fee of $28,190, and purported "Contingent Interest" of up to $900,000 (10% of the face value of the Jefferson Pilot Policy), the latter of which was to be calculated at the maturity of the Reiter Note pursuant to the third-party valuation methodology contained in each of the Defendants' form Promissory Notes.    Pursuant to the Scheme, the face of the Reiter Note indicated that "[t]he Contingent Interest that will actually be charged under this Note will depend upon the Policy's fair market value on the Maturity Date or prepayment of this Note and could be as low as $0.00.  Accordingly, the exact Finance Charge will not be known until the actual Maturity Date or prepayment of this Note."

77.    Of the total purported loan proceeds, $354,600 were paid directly by MCC to the insurer as payment of two years' premium in the Jefferson Pilot Policy as contemplated by the Scheme.   The Trustees fail to account for the remaining One Hundred and Forty Thousand Dollars ($140,000) distributed from the Reiter Trust.   The remainder of the purported "principal" of the Reiter Note was distributed to Christopher Reiter upon termination of the Reiter Trust for the purpose of "covering" his tax bill created by the Scheme.  This final Reiter Trust distribution was in violation of the terms of the Reiter Trust, which required the termination distribution to be distributed to the Trustee of the 2000 Trust.

78.    At no time did the Trustees of the Reiter Trust or the defendants ever inform, contact, advise, or seek the permission of the beneficiary of the Reiter Trust, Christopher Reiter, concerning these transactions, nor did any of the defendants ever reveal (i) the amount of interest paid to MCC, which was $1,077,965 on $563,800 of principal, (ii) that the defendants absconded with

19

$990,000 during the course of the Scheme and (iii) that Christopher Reiter would be hit with tax bill of $374,666 as a result of the Scheme.

79.   Subsequent to their execution, the Note and Assignment were assigned by MCC to Spurling and/or Spurling II. As assignee, Spurling is subject to all Plaintiffs' defenses and claims of plaintiff arising out of the Scheme.

80.   Upon information and belief, Spurling and/or Spurling II and their officers were fully aware of all aspects of the Scheme prior to MCC's implementation of the Scheme, including all unlawful acts performed by MCC, Doten, and MCC's other agents and/or co-conspirators and had, by prior agreement, arranged with MCC to acquire the loans made and/or policies at issue as part of the Scheme.

81.   Pursuant to the Scheme, at the maturity of the Reiter Note, the defendants "determined" that the Reiter Trust owed $900,000 in "contingent interest" and assessed this sum as part of the total payment due in satisfaction of the Reiter Note.

82.   Pursuant to the Scheme, at no time did MCC, the Trustees, or the defendants perform, obtain, or complete the third-party valuation required by the Reiter Note and associated documents.

83.   Accordingly, the defendants demanded approximately $1,641,765 in payment from the Reiter Trust as payment due and owing on the Reiter Note, including all interest and fees.

84.   Since Mrs. Reiter lay ill, the Trustees determined they could make additional commissions and fees by selling the policy on the open market. No Trustee or defendant ever contacted Christopher Reiter regarding this decision nor did they inform the plaintiffs that they would be deprived of the policy and/or the full profits thereunder by these actions.

85.   In violation of their fiduciary responsibilities and other laws, Doten, Shelbaugh, and/or Swope arranged for the sale of the Jefferson Pilot Policy in the

20

gross amount of $2,700,000 to Peachtree, apparently brokered by Shelbaugh and/or Rumson Capital and/or National Wealth.

86.     Of this gross amount, however, the defendants structured the transaction so that Doten, Shelbaugh, Swope, and/or other defendants and co-conspirators received a total broker commission of $720,000 taken from the gross amount tendered for the Jefferson Pilot Policy, reducing the amount that would ultimately be received by the Reiter Trust to $1,980,000.  Such commissions were never disclosed by the defendants to plaintiffs nor were they disclosed to the Internal Revenue Service.  For example, Swope and/or Swope Lamberson P.A. received a commission of $163,000 on the sale of the Jefferson Pilot Policy.  This amount does not even include the $140,000 distribution requested by Swope, for which he and his firm fail to provide any accounting.  These commissions were and are unlawful and inequitable, constituting a breach of fiduciary duty, breach of contract, fraud and fraudulent concealment, and unjust enrichment, among other violations, as well as being part of the overall Scheme.

87.     From this amount, the Trustees, in a violation of their fiduciary duties, breach of contract, and other unlawful and inequitable actions, caused approximately $1,641,756 to be paid directly to Spurling II from the Reiter Trust at the direction of MCC, largely in satisfaction of the unlawful and contingent interest MCC and the defendants claim that they were due under the Reiter Promissory Note.

88.     Presumably, the purpose of this payment was to compensate Spurling II for the funds it had advanced to MCC for assignment of the rights in the Reiter Note and Jefferson Pilot Policy shortly after the Reiter Note was executed.

89.     At no time were the Plaintiffs made aware of these unlawful and inequitable transactions purportedly taken on their behalf and in their best interest.

90.     Ultimately, Christopher Reiter received a distribution of approximately $374,666 from the Reiter Trust, an amount far less than the amount

21

to which he was entitled and would have received had the illegal Scheme not been executed, a traditional premium financing agreement been in effect, the obligations under the Reiter Trust been fulfilled, and the applicable law been followed.

91.   Subsequently, Christopher Reiter, as beneficiary of the Reiter Trust, was issued a K-1 Federal Income Tax form from the Reiter Trust assessing Christopher Reiter $1,626,000 of capital gain based upon the purported sale and/or surrender of the Jefferson Pilot Policy to MCC, upon which he was assessed and paid a tax liability of $406,000 – an amount in excess of the final distribution he received as beneficiary of the Reiter Trust.

92.   Plaintiffs were damaged by the Scheme in numerous ways, including (a) the lost opportunity to sell the Policy at a profit of at least $1,100,000, even taking into account the obligation to pay the unlawful interest; (b) the imposition and payment of unlawful interest; (c) the imposition and payment of additional federal income taxes arising from the purported transactions; and (d) by their loss of Mrs. Reiter's insurability equivalent to the amount of the Jefferson Pilot Policy and/or the retention of the Jefferson Pilot Policy.

93.   At all times relevant to this Complaint, the Reiter Trust, pursuant to the Scheme, was a subterfuge under the control and dominion of MCC, its agents, and co-conspirators used to effect the Scheme and to conceal it from the plaintiffs.

94.   Despite numerous requests for a full accounting, plaintiffs have never been provided with this accounting, as required.

95.   In fact, at all times, the Defendants have acted to conceal their wrongful actions, fraudulently and otherwise, in an effort to avoid discovery of and recovery therefor, including attempting to structure the Scheme so that the victims purportedly need not be notified of or approve any of the transactions arising thereunder; refusing to provide the victims notification or evidence of any of the material transactions; and structuring the transactions so that the details

22

thereof – for example, the net amount gained by the sale of the Reiter policy of $2,700,000 – is not presented and does not appear on transactional financial documents associated with the Reiter Trust and/or provided to the plaintiffs.

## RICO ALLEGATIONS

96.     Defendants have engaged in a fraudulent scheme, common course of conduct and conspiracy to obtain unlawful and unconscionable profits from the elderly victims of the Scheme and their families; to wrongfully obtain insurance policy proceeds, depriving their victims of the benefits thereof and/or some or all of their available insurable interest; to obtain unconscionable, unlawful, and inequitable profits on the sale of or collection under those policies thereafter; to obtain unconscionable, unlawful, and inequitable sales commissions on the disposition of these policies; and to cause adverse tax consequences to the victims, all to the detriment of the plaintiffs.

### The MCC Predatory Enterprise

97.     Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1961(3) and have sustained injury to their person, business or property as a result of the acts and conduct of the defendants herein.   Based upon plaintiffs' current knowledge, the following constitute one or more groups of persons or entities who associated in fact in the ongoing Scheme, hereinafter referred to as the MCC Predatory Enterprise" (or the "RICO Enterprise") and/or for its common purpose, and that are responsible for targeting and preying upon elderly persons of substantial means and exploit their insurable interests in their lives through unfair and deceptive practices, thereby profitting handsomely thereby, to the detriment of such elderly victims and their beneficiaries, and constitute an "enterprise" as that term is defined in 18 U.S.C. § 1961(4):

a)      Defendants, including insurance premium financier defendants MCC and Spurling;

23

b)   Remunerated, conflicted Trustees of the Reiter Trust, Doten and Swope;

c)   Insurance agents such as Jacobsen, Brown and Shelbaugh and accountants Swope and Swope Lamberson;

d)   Brokers and sales agents who earn or receive commissions for selling insurance policies to the trusts formed by the Scheme;

e)   Brokers and sales agents who earn or receive commissions for selling insurance policies purportedly held by the trusts, but assigned to one or more of the Defendants;

f)   Facilitators of the sale of such insurance policies, including Rumson Capital and National Wealth Advisors;

g)   Additional financing and intermediary co-conspirators, including hedge funds and others that invest in or otherwise infuse MCC with capital to finance the Scheme; and

h)   Third-party stranger, predatory investors, purchasers or acquirers of such policies from the trusts formed pursuant to the Scheme, including plaintiffs'.

98.   The MCC Predatory Enterprise is an ongoing and continuing organization consisting of corporations, individuals, partnerships, limited liability companies, and other legal organizations and entities associated for the common purpose of promoting, establishing, and/or arranging for the predatory insurance premium financing insurance transactions and/or related insurance policy investments pursuant to the Scheme and/or the sale of such policies thereunder to or from the plaintiffs and other elderly victims through deceptive and misleading practices or materials; the imposition of inequitable interests; and in deriving unconscionable profits or other property from those activities.

99.   The MCC Predatory Enterprise engages in and affects interstate commerce because it involves activities across state boundaries, such as the

24

marketing, promotion, advertisement, extension, maintenance, and collection of premium financing and/or marketing, promotion, and facilitation of the sale of insurance policies pursuant to the Scheme, as well as the transfer and receipt of commercial paper, premiums, commissions, loan proceeds, interest, fees, and other charges from the sale of products and/or services associated with the Scheme.

100. Within this RICO Enterprise, there exists a common communication network by which co-conspirators share information on a regular basis. The MCC Predatory Enterprise uses this common communication network for the purpose of marketing, promoting, soliciting, selling, and entering into premium financing arrangements and the associated issuance and sale or investment in the proceeds of life insurance policies, as well as to carry out all of the transactions required by the Scheme.

101. Each participant in the MCC Predatory Enterprise has a systematic linkage because there are contractual relationships, financial ties, and continuing coordination of activities among them. Defendants engage in consensual decision-making to implement their fraudulent scheme and to function as a continuing unit for the common purpose of providing funding, securing policies, assessing interest and fees, exacting payments, transferring policies, selling policies, and distributing the profits and/or commissions on all such sales. Furthermore, the RICO Enterprise functions as a continuing unit with the purpose of assisting with, perfecting, and furthering their wrongful and fraudulent scheme to market MCC premium financing and wrongfully obtain insurance policies on elderly victims.

102. Defendants knowingly participate in and are members of the MCC Predatory Enterprise, which has an ascertainable structure separate and apart from the pattern of racketeering activity in which it and other co-conspirators engage.

103. Pursuant to their scheme, the MCC Predatory Enterprise participants failed to disclose key risks and negative features of their premium financing and investment scheme to their victims and intentionally limit the substantive information prospective victims, including Mrs. Reiter, received.    Each of the defendants exercises substantial control over the direction of their RICO Enterprise by, among other actions:

      a)     designing and marketing the premium arrangement financing and the Scheme in a manner that inflict adverse consequences on the victims and/or to deprives them of insurance policies, opportunities, profits, interests, funds, and other benefits;

      b)     designing and marketing the premium financing arrangement and Scheme in a manner that does not disclose the material adverse effects of the financing arrangement and Scheme;

      c)     designing and marketing the premium financing arrangement and Scheme in a manner that does not adequately disclose the opportunities, profits, interests, and other benefits that the victims will be deprived of as a result of the financing and the Scheme;

      d)     drafting the documents necessary to effectuate the Scheme;

      e)     executing the documents necessary to effectuate the Scheme;

      f)     effecting the transactions necessary to effectuate the Scheme;

      g)     effecting sales of the associated life insurance policies and retaining substantial commissions associated with the policies, as contemplated by and in furtherance of the Scheme;

      h)     utilizing the Scheme and premium financing arrangement to impose unconscionable interest and other associated terms on the victim, all in a concerted effort to obtain the polices and/or

26

exorbitant profits in the form of interest, fees, payment under the policies, and/or sales of the policies;

i)   developing sales techniques to induce victims to enter into the premium financing arrangement and the Scheme;

j)   rewarding sales agents with exorbitant commissions for disposition of the associated insurance policies;

k)   financing the loans and/or the acquisitions and/or the transfer of the policies, all in furtherance of ultimately acquiring the benefits of the policies or enjoying exorbitant profits from the sale or disposition thereof;

l)   concealing important information from the victims of the predatory scheme in order to keep its victims in the dark, disadvantage them, neutralize any competition for acquiring the rights to their insurance policy and proceeds upon their death, or otherwise adequately informing them of other available financial arrangements that would enable said seniors to fairly enjoy the true market value of their insurable interest on their own lives upon assignment or sale and avoid being exploited by assigning such a valuable interest to stranger predatory financiers or investors for far less than their value;

m)   violating and abdicating their fiduciary duties with respect to their elderly victims, including Mrs. Reiter.

104.   At all relevant times, each participant in the MCC Predatory Enterprise was aware of the Scheme, was a knowing and willing participant in the Scheme, and reaped financial benefits and profits from the Scheme.

## RICO CONSPIRACY

105.   Defendants have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy.

27

106. Defendants have engaged in a conspiracy to obtain insurance polices on those in which they have no insurable interest and to unfairly, fraudulently or deceptively realize gain from those policies, whether by payment of the death benefit or the subsequent sale of those policies; as well as gain from inequitable and unconscionable interest and fees arising from MCC's premium financing.

107. Each defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy and has participated in the common course of conduct to commit these fraudulent, deceptive, unconscionable, unlawful, and inequitable acts in persuading the victims to participate in the Scheme and utilize MCC's premium financing, despite the fact that the transactions performed pursuant to the Scheme will cause harm to the victims, plaintiffs, and others including the loss of profits, potential loss of insurability, the loss of receiving the benefits of the policy, the incurring of unconscionable interest, fees, and other expenses, increased tax liabilities, and other adverse effects and consequences.

### Use of the Mails and Wires

108. Defendants have used numerous mail and interstate wire communications to create and manage the Scheme as described herein.

109. Defendant's fraudulent use of the mails and wires included communications sent by members of the MCC Predatory Enterprise to each other, to Plaintiff and other elders, and to third parties via U.S. Mail, commercial carrier, wire or other interstate electronic media.

110. Defendant's misrepresentations, acts of concealment and omissions were made knowingly and/or to deceive and dispossess plaintiffs of valuable rights, interests or property through unfair and deceptive means, conduct and practices, as more fully discussed above.

111. Defendants misrepresentations and omissions were material and relied upon by plaintiffs, as demonstrated by Mrs. Reiter's entry into the premium financing transaction and subsequent assignment complained of herein.

### Predicate Acts

112. Section 1961(1)(B) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, defendants have and continue to engage in conduct violating each of these laws to effectuate their scheme.

### Violations of 18 U.S.C. §§ 1341 and 1343

113. For the purpose of executing and/or attempting to execute the above-described Scheme, defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service and/or commercial interstate carriers, including, but not limited to, marketing material, forms, applications, contracts, promissory notes, assignments, correspondence, premium and commission payments, reports, data, summaries, statements and other materials relating to the marketing, financing and sale of defendants predatory insurance premium financing and investment Scheme.

114. For the purpose of executing and/or attempting to execute the above-described Scheme to defraud or obtain money by unfair and deceptive means and/or false pretenses, representations, concealments of material fact and other deceit and violations of trust, confidence and fiduciary duty, defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, which include, but are not limited to, consumer information, applications, policy forms, disclosure forms, field memos, correspondence, premium and commission payments, reports, data, summaries, account statements, faxes and

other materials relating to the financing, marketing and sale of insurable interests respecting plaintiff Mrs. Reiter and other elderly.

115. The matter and things transmitted or received by defendants via the U.S. Postal Service, commercial carrier, wire or other interstate electronic media as identified above include, *inter alia* — material omissions of fact, misrepresentations and omissions of material information concealing that Defendants would and did use the fraudulent and unlawful sales techniques and presentations and the deceptive and misleading practices, contracts, communications and devices described above to solicit and induce Mrs. Reiter — as they did to other seniors — into entering into and becoming a victim of the RICO Scheme.

116. Defendant's unfair and deceptive conducts, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving or injuring plaintiffs and obtaining their valuable right and property for defendants' gain.

117. As a result, plaintiffs have been injured in their business or property by defendants' overt acts of mail and wire fraud, and by their aiding and abetting each other and unnamed co-conspirators' acts of mail and wire fraud.

## Pattern of Racketeering Activity

118. Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past 10 years. In fact, defendants have committed or aided and abetted the commission of thousands of acts of racketeering activity. Each racketeering act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including the plaintiffs and others.

30

119. The multiple acts of racketeering activity which defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 3961(5).

120. Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." Through the patterns of racketeering activities outlined above, defendants have conducted and participated in the affairs of the MCC Predatory Enterprise.

121. Defendants' willfully agreed to, and did, materially participate, directly or indirectly, in the conduct of the affairs of the said MCC Predatory Enterprise through a pattern of racketeering activity comprised of numerous acts of mail fraud and wire fraud, and so participated in violation of 18 U.S.C. § 1962(c).

122. Additionally, Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Defendants conspired to exploit, victimize, defraud and dispossess plaintiffs — as they have done to others — of their valuable rights and interest, pursuant to the Scheme described above, violation of 18 U.S.C. § 1962(d).

### Fraudulent Concealment And Equitable Tolling

123. Defendants have affirmatively and fraudulently concealed their unlawful Scheme, conspiracy, and course of conduct from plaintiffs. Elder plaintiff, Mrs. Reiter did not know and could not reasonably have known of defendants' fraudulent Scheme and could not have upon the exercise of reasonable

31

due diligence discovered the falsity of defendants' representations, or their deceptive and unfair practices and conduct, or the concealed information.

124. To this day, Defendants continue to fraudulently conceal their practices from plaintiffs and the public alike. Throughout this time period, defendants refused to release, disclose or provide information about their practices in a meaningful way that would enable plaintiffs to discover their fraudulent Scheme and practices.

125. As a result of the foregoing, plaintiffs could not reasonably discover the unlawful and unethical practices described herein and did not do so until recently.

126. Defendants' conduct is continuing in nature.   Any statute of limitations applicable to any claims brought by plaintiffs as a result of the conduct alleged herein has been tolled as a result of defendants' fraudulent concealment.

## FIRST CLAIM FOR RELIEF

### Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a)-(d)
### (Against All Defendants)

127. Plaintiffs incorporate by reference all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

128. This claim arises under 18 U.S.C. § 1962(a)-(d), which provides in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code [18 U.S.C.S. § 2), to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

32

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

It shall be unlawful for any person to conspire to violate any of the provisions of subsection...(c) of this section.

129. As a direct and indirect result of defendants' conduct as described above, substantial income was generated, received by, and came under the control of defendants. Defendants used that income to establish and/or operate the MCC Predatory Enterprise, which was engaged in interstate and foreign commerce. Therefore, defendants have violated 18 U.S.C. § 1962(a).

130. Defendants, through the conduct described above, acquired, maintained and exercised control over the MCC Predatory Enterprise, which was engaged in or affected interstate and foreign commerce. Therefore, defendants have violated 18 U.S.C. § 1962(b).

131. In violation of 18 U.S.C. § 1962(c), defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the MCC Predatory Enterprise through a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5).

132. At all relevant times, defendants were "persons" within the meaning of 18 U.S.C. § 1961(3), because each was "capable of holding a legal or beneficial interest in property."

33

133. The MCC Predatory Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as individuals and other entities associated-in-fact for the common purpose of engaging in defendants' profit-making scheme.

134. The MCC Predatory Enterprise was created and/or used as a tool to carry out the elements of defendants' illicit scheme and pattern of racketeering activity. The RICO Enterprise has ascertainable structure and purpose beyond the scope and commission of defendants' predicate acts and conspiracy to commit such acts. The RICO Enterprise is separate and distinct from defendants.

135. Said RICO Enterprise has engaged in, and its activities affected, interstate and foreign commerce by entering into Premium Financing Agreements with hundreds of persons within and without the United States.

136. The RICO Enterprise actively disguised the nature of defendants' wrongdoing and concealed or misrepresented defendants' participation in the conduct of the MCC Predatory Enterprise to maximize profits while minimizing their exposure to criminal and civil penalties.

137. Each defendant exerted substantial control over the MCC Predatory Enterprise, and participated in the operation and managed the affairs of the MCC Predatory Enterprise as described herein.

138. Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years. The multiple acts of racketeering activity which defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

139. Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

34

140. **Mail Fraud:** Defendants have violated 18 U.S.C. § 1341 by sending or receiving materials via U.S. mail or commercial interstate carriers for the purpose of executing the Scheme by means of false pretenses, misrepresentations, promises, and/or omissions. The materials include, but are not limited to: applications, contracts, trusts, promissory notes, commission payments, reports and other materials relating to the execution of the Scheme.

141. **Wire Fraud:** Defendants have violated 18 U.S.C. § 1343 by transmitting and receiving materials by wire for the purpose of executing their scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and/or omissions. The materials transmitted and/or received include, but are not limited to those mentioned above.

142. **Interstate Travel:** Upon information and belief, Anderson and Brown conducted interstate travel, including one or more trips to Florida from California, to promote the Scheme and secure agents and co-conspirators to further and effectuate the Scheme, to make fraudulent representations concerning the premium financing product and its use, and/or to secure victims of the Scheme.

143. Many of the precise dates of defendants' fraudulent uses of the U.S. mail and wire facilities and/or interstate travel have been deliberately hidden and cannot be alleged without access to the defendants' books and records. Indeed, the success of defendants' scheme depends upon secrecy, and defendants have withheld details of the scheme from plaintiffs. Generally, however, plaintiffs can describe the occasions on which the predicate acts of mail and wire fraud would have occurred and how those acts were in furtherance of a scheme. They include thousands of communications to perpetuate and maintain the scheme, including, among other things:

35

a)   transmitting misleading materials and information concerning the features of the Premium Financing Agreements and Scheme;

b)   processing applications for MCC's Premium Financing Agreements;

c)   transmitting and receiving applications and associated materials concerning life insurance policies;

d)   transmitting and receiving financial documents and transactions, including electronic wire transfers and electronically signed documents, commissions, interest, fees, and other sums;

e)   transmitting and receiving the form documents that effectuate the Scheme, including the Trust Agreements, Promissory Notes, Assignments, purported valuations, and similar documents;

f)   transmitting authorizations to engage in acts necessary to effectuate the Scheme;

144.   The materials sent or received by defendants via the U.S. mail, commercial carrier, wire or other interstate electronic media, contained, *inter alia:*

a)   misrepresentations or omissions about the risks and features of the premium finance arrangements;

b)   misrepresentations or omissions about the significant commissions, profits, interest, fees, charges, and tax consequences flowing from and as a result of the premium finance arrangements and the Scheme;

c)   misrepresentations or omissions about the nature of the relationship among MCC, the insurance sales agents, the Trustees, and the other Defendants and/or co-conspirators

36

d)   misrepresentations or omissions about the inappropriateness, unlawfulness, inequity, and unconscionability of the terms of MCC's Premium Financing Agreements, as well as the consequences of the arrangement;

e)   misrepresentations or omissions about the nature of payments, sums, or obligations owed, including unlawful interest

f)   misrepresentations or omissions about the true and concealed purpose of the Scheme;

g)   omissions failing to disclose the conflict of interests of one or more Trustees effecting the Scheme on behalf of the Defendants;

h)   misrepresentations or omissions about value, costs, profits, or other financial information or data related to the insurance policies at issue; and

i)   improper or unlawful collections, assessments, payments, invoices, fund transfers, or similar transactions.

145. Defendants knowingly and intentionally made these misrepresentations, acts of concealment and failures to disclose so as to deceive plaintiffs. Defendants either knew or recklessly disregarded that these were material misrepresentations and omissions, and plaintiffs and the class relied on the misrepresentations and omissions as set forth herein.

146. Defendants have obtained money and property belonging to plaintiffs as a result of these statutory violations. Plaintiffs have been injured in their business or property by defendants' overt acts of mail and wire fraud, by their aiding and abetting each others' acts of mail and wire fraud, by interstate travel, illegal gaming, and unlawful debt.

147. In violation of 18 U.S.C. § 1962(d), defendants conspired to violate 18 U.S.C. § 1962(c) as described herein. Various other persons, firms and

37

corporations, not named as defendants in this Complaint, have participated as co-conspirators with defendants in these offenses and have performed acts in furtherance of the conspiracy.

148.  Each defendant aided and abetted violations of the above laws, thereby rendering them indictable as a principal in the 18 U.S.C. §§ 1341 and 1343 offenses pursuant to 18 U.S.C. § 2.

149.  Plaintiffs have been injured in their property by reason of defendants' violations of 18 U.S.C. § 1962(a) and (d), including lost access to needed funds; unnecessary and concealed fees, interest; charges and penalties that they would not have otherwise incurred; excessive interest; lost opportunities to obtain the life insurance policy or policies at issue and/or the profits associated with the sale of such policy or policies; and additional tax burdens and consequences.   In the absence of defendants' violations of 18 U.S.C. § 1962(a) and (d), plaintiffs would not have incurred these costs and expenses, or they would have incurred less.

150.  Plaintiffs relied, to their detriment, on defendants' and their agents and/or co-conspirators fraudulent misrepresentations and omissions, which, upon information and belief, were made by means of Web sites, mass mailings, newspaper advertisements, telephone calls, marketing materials, in-person visits, demonstrations, form documents, and virtually uniform representations or omissions.   Plaintiffs' reliance is evidenced by her surrender or assignment of substantial value represented by her insurance policy and her insurable interest on her life to the defendants.

151.  Plaintiffs' injuries were directly and proximately caused by defendants' racketeering activity.

152.  Defendants knew that Mrs. Reiter relied on their representations and omissions and knew that she would incur substantial damages and/or losses as a result.

38

153. Under the provisions of 18 U.S.C. § 1964(c), plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit, and reasonable attorneys' fees.

154. Defendants are accordingly liable to plaintiffs for three times their actual damages and/or losses as proved at trial, plus interest and attorneys' fees.

## SECOND CLAIM FOR RELIEF

### Violation of California Business & Professions Code § 17200, *et seq.*
### (Plaintiffs for Themselves and the Public Against All Defendants)

155. Plaintiffs incorporate all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

156. California Bus. & Prof. Code § 17200, *et seq.* prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice." Defendants have violated § 17200's prohibition against engaging in an unlawful act or practice by, inter alia, the following:

a) violating the statutes prohibiting defendants' conduct, as described herein, including violations of RICO, 18 U.S.C. § 1962;

b) violating Cal. Welf. & Inst. Code § 15610.30;

c) violating Cal. Civil Code §§ 1709, 1710, 1572, 1573 and 1575; and

d) violating or aiding and abetting a violation of Cal. Corp. Code §§ 25230 and 25235.

157. Further, detailed in the preceding paragraphs, defendants conspired to deceive or defraud plaintiffs through the Scheme by entering into Premium Finance Arrangements and resulting exploitation of an elderly person's valuable insurable interest on her life and robbing her intended beneficiaries of the enjoyment thereof that she intended for them, through unfair and deceptive means as alleged above.

39

158. Defendants aided and abetted each other in accomplishing the wrongful acts. In doing so, defendants acted with an awareness of their wrongdoing and realized that their conduct substantially assisted in the accomplishment of the wrongful conduct.

159. Plaintiffs reserve the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

160. As a result of defendants' practices, plaintiffs have actually been injured.

161. Unless defendants are enjoined from continuing to engage in the unlawful, fraudulent and unfair business practices described above, members of the general public residing within the United States, including California, will continue to be damaged.

162. Pursuant to Cal. Bus, & Prof. Code § 17203, plaintiffs seek an order requiring defendants to immediately cease such acts of unlawful, unfair and fraudulent business practices and requiring them to return the full amount of money improperly collected – including, but not limited to, commissions and profits from the sale of life insurance policies and any income derived therefrom– to all those who have paid them, plus interest and attorneys' fees.

### THIRD CLAIM FOR RELIEF

### Breach of Fiduciary Duty
### (Against All Defendants)

163. Plaintiffs incorporate all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

164. By virtue of their purported positions as financial advisors with access to personal and confidential information, including that of plaintiffs and because of their superior knowledge and ability to manipulate and control senior citizens' finances and legal status, defendants assumed fiduciary duties to plaintiffs.

40

165.  These entities and defendants owed to plaintiffs the highest duties of loyalty, honesty, fidelity, trust, and due care in their fiduciary obligations, and were required to use their utmost ability to provide estate planning and investment advice in a fair, just and equitable manner, and to act in furtherance of the best interests of plaintiffs so as to benefit their clients, and not themselves, whether acting as a Trustee of the trust at issue or otherwise

166.  As set forth above, defendants breached their obligations and fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision, by inter alia:

a)    Failing to disclose the true characteristics of the Premium Finance Arrangements entered into with plaintiffs;

b)    Unreasonably, and in bad faith, refusing to give sufficient consideration to the welfare of plaintiffs rather than their own financial interests;

c)    Maintaining an unlawful scheme and conspiracy in violation of § 1961(1)(B) of RICO;

d)    Entering into transactions on terms that were patently, obviously, and conspicuously adverse to the best interests of the plaintiffs and, in particular, the beneficiaries of the trusts and/or insurance policies at issue

167.  As described herein, defendants recklessly or knowingly breached their fiduciary duties by orchestrating, devising, carrying out, participating in, and/or failing to prevent, terminate, or timely correct the wrongdoing alleged herein.

168.  Each of these violations was achieved because defendants willingly, knowingly, recklessly, grossly negligently, negligently, and in bad faith sought to gain their own financial advantage to the disadvantage of plaintiffs and/or to engage in self-dealing to the detriment of the plaintiffs.

169.  As a direct and proximate result of defendants' violations of their fiduciary duties, plaintiffs have been injured, and suffered and continue to suffer

41

economic and noneconomic losses, all in an amount to be determined according to proof at trial.

170.  In light of the foregoing, plaintiffs request that the Court deem this a constructive fraud, and require defendants to immediately rescind contracts and agreements to which plaintiffs and the class are subject.

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Breach of Fiduciary Duty
### (Against All Defendants)

171.  Plaintiffs incorporate all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

172.  Defendants aided and abetted, encouraged, and rendered substantial assistance to one another in order to accomplish the wrongful acts complained of herein. In aiding and abetting and substantially assisting the commission of the acts complained of, defendants acted with an awareness of their wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein. In performing these acts, Defendants either acted as agents of MCC, or MCC ratified such acts, or both, and benefited financially from their scheme.

173.  As a result of the wrongful conduct of defendants, plaintiffs have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

174.  In addition, the wrongful acts of defendants were done maliciously, oppressively, and with the intent to mislead and defraud, and plaintiffs are entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of MCC.

42

# FIFTH CLAIM FOR RELIEF

## Fraudulent Concealment, Cal. Civ. Code § 1710, *et seq.*
## (Against All Defendants)

175. Plaintiffs incorporate all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

176. Defendants intentionally concealed the following material information from plaintiffs:

a) Material information concerning the amount and percentage of interest to be paid; commissions paid; the intention to obtain the life insurance policies, whether to resell them or retain them to obtain the death benefits thereunder; their retention of exorbitant profits; and other facts material to the premium financing and acquisition and/or disposition of the insurance policies at issue;

b) The conflicts of interest inherent in the relationships as established by the Scheme;

c) The disadvantages of entering into the Premium Finance Arrangements, including tax and estate consequences and penalties.

177. Plaintiffs relied on these omissions, as shown by their entry into the Premium Finance Arrangements and payment of premiums and other charges and fees.

178. Defendants performed the wrongful acts with the intent of gaining their own financial advantage to the disadvantage of plaintiffs.

179. Defendants aided and abetted each other in accomplishing the wrongful acts. In doing so, defendants acted with an awareness of their wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct.

180. In performing these acts, each defendant either acted as an agent of MCC, or MCC ratified such acts, or both.

43

181. As a result of defendants' wrongful conduct, plaintiffs have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined at trial.

182. The wrongful acts of defendants were done maliciously, oppressively, and with the intent to mislead and defraud. Plaintiffs are entitled to punitive and exemplary damages in an amount appropriate to punish and set an example of defendants pursuant to Cal. Civil Code § 3294, *et seq.*

## SIXTH CLAIM FOR RELIEF

### Unjust Enrichment and Imposition of Constructive Trust
### (Against All Defendants)

183. Plaintiffs incorporate by reference all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

184. Plaintiffs conferred a benefit on defendants by entering into Premium Finance Arrangements with defendants and their agents.

185. Defendants owed various duties to plaintiffs as a result of their fiduciary relationships.

186. By engaging in the Scheme, defendants realized the benefits in the form of commissions, profits from the sale of plaintiffs' insurance policies to third parties, service charges, premiums and other fees expenses and charges.

187. As a result of the relationships between and among the parties and the facts stated above, defendants will be unjustly enriched if they are permitted to retain such funds; therefore, a constructive trust should be established over the monies that were obtained by or paid to defendants. These monies are traceable to defendants.

188. Plaintiffs have no adequate remedy at law against defendants.

189. Plaintiffs are entitled to disgorgement by all defendants of the profits they derived from the Scheme.

44

## SEVENTH CLAIM FOR RELIEF

### Fraudulent Inducement/Misrepresentation/Common Law Fraud
### (Against All Defendants)

190. Plaintiffs repeat and reallege all allegations contained in the Complaint as if set forth separately in this Cause of Action.

191. The unfair and deceptive conduct, including the use of material misrepresentations and concealments as set forth above were committed to the RICO defendants with reckless disregard of plaintiffs' rights or positions and were true.

192. Plaintiffs' rights or positions and with the intent to induce Mrs. Reiter to enter into the predatory insurance transaction complained of herein to defendants financial advantage to the disadvantage of plaintiffs.

193. Mrs. Reiter relied upon the misrepresentations and concealment of facts set forth above and her reliance was reasonable and justifiable.

194. Defendants aided and abetted each other in accomplishing the wrongful acts. In doing so, they acted with an awareness of its wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct.

195. Plaintiffs' have suffered and continue to suffer economic and non-economic losses because of defendants' wrongful conduct. The amount of such losses will be determined according to proof at trial.

196. The wrongful acts of defendant was done maliciously, oppressively and with the intent to mislead and defraud plaintiffs are entitled to punitive and exemplary damages in an amount appropriate to punish and set an example of Defendants.

197. Furthermore, plaintiffs seek an order enjoining defendants from engaging in this fraudulent course of conduct and for any further equitable relief the fact finder finds appropriate.

45

# EIGHTH CLAIM FOR RELIEF

### For Damages Under Florida Law Re: Usury
### (Against All Defendants)

198.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully restated herein.

199.  On or about July 26, 2005, Doten executed various loan documents on behalf of the Trust, including a promissory note for $563,800 (the "Note"). $354,600 of the proceeds of the loan were paid by Mutual to the insurer for two-years' premiums on the Policy.

200.  Accordingly, $180,000 remained in the trust.  Subsequently, Swope, as trustee, requested an additional $140,000 from the trust.

201.  The remainder of the "principal" of the Note was retained by MCC or its agents.

202.  Therefore, the actual amount of MCC's loan was no more $494,600.

203.  The $1,110,734 was knowingly and willfully charged by MCC and charged and received by Spurling as interest on the loan of $494,600.

204.  The interest rate on that loan amounts to in excess of one hundred percent (100%) per annum.

205.  The interest rate knowingly and intentionally charged exceeds that allowed by Section 687.03, Florida Statutes.

206.  Spurling has willfully and knowingly charged and received interest on the loan in excess of that allowed by law and is guilty of criminal usury under § 687.071 (3), Florida Statutes.

207.  The loan is rendered unenforceable by § 687.071 (7), Florida Statutes.

208.  Wherefore Plaintiffs pray for judgment in the amount of the principal of the loan, and pursuant to § 687.04, Florida Statutes, for twice the amount of interest charged on the loan, and awarding attorney's fees and costs to Plaintiff and such other relief as may be appropriate.

46

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, pray for judgment against Defendants as follows:

A.     For a temporary, preliminary and permanent order for injunctive relief enjoining defendants from pursuing the practices complained of above;

B.     For a temporary, preliminary and permanent order for injunctive relief requiring defendants to undertake an immediate public information campaign to inform members of the general public as to their prior practices and notifying the members of the putative class of the potential for restitutionary relief;

C.     For an order requiring disgorgement and restitution of defendants' ill-gotten gains and payment of restitution to plaintiffs and the class all funds acquired by means of any practice declared by this Court to be unlawful, fraudulent or unfair;

D.     Imposition of a constructive trust;

E.     For reasonable attorneys' fees and costs of investigation and litigation under 18 U.S.C. § 1964(c); Cal. Welf. & Inst. Code § 15657.5, *et seq.;* and the common fund doctrine;

F.     For compensatory, special and general damages according to proof;

G.     For punitive and exemplary damages under Cal. Civ. Code § 3294;

H.     For treble damages and penalties pursuant to 18 U.S.C. § 1964(c); Cal. Bus. & Prof. Code § 17206.1; and Cal. Ins. Code § 789;

I.     For double damages under Cal. Probate Code § 859;

J.     For transfer of the wrongfully obtained monies and/or property under Cal. Probate Code §§ 850-859, *et seq.;*

K.     For costs of suit, pre-judgment, and post-judgment interest; and

L.     Such other and further relief as the Court may deem necessary or appropriate.

47

# JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: July 14, 2009

BARRACK, RODOS & BACINE
STEPHEN R. BASSER
SAMUEL M. WARD

_____
STEPHEN R. BASSER

One American Plaza
600 West Broadway, Suite 900
San Diego, CA  92101
Telephone:  (619) 230-0800
Facsimile:  (619) 230-1874

BARRACK, RODOS & BACINE
JEFFREY GITTLEMAN
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone:  (215) 963-0600
Facsimile:  (215) 963-0838

RICHARD L. CREIGHTON, JR.
WILLIAM A. POSEY
W. JEFFREY SEFTON
KEATING MUETHING &
KLEKAMP PLL
One East Fourth Street
Suite 1400
Cincinnati, Ohio 45202
Telephone:  (513) 579-6400
Facsimile:  (513) 579-6457

Attorneys for Plaintiffs

RICO COMPLAINT

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| PATRICIA C. REITER an individual and CHRISTOPHER J. REITER and JAMES A. SINGLER, as Successor Trustee of the Jack L. Reiter and Patricia C. Reiter Irrevocable Trust U/A/D/ August 27, 2000 | MUTUAL CREDIT CORPORATION (see attached) |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Stephen R. Basser, Barrack, Rodos & Bacine, 600 West Broadway, Suite 900, San Diego, CA 92101 (619) 230-0800 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No        ☐ MONEY DEMANDED IN COMPLAINT: $ in excess of $2 million

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

CIVIL RICO - 18 U.S.C. § 1962 (a)- (d)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☑ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

## SACV09 -811 AG (RNBx)

FOR OFFICE USE ONLY:   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

VIII(a). IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed? ☑No  ☐ Yes
If yes, list case number(s): _____

VIII(b). RELATED CASES: Have any cases been previously filed in this court that are related to the present case? ☑No  ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
　　　　　　　　　　　　　　　☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
　　　　　　　　　　　　　　　☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
　　　　　　　　　　　　　　　☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Ohio, Kentucky, Florida |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| See Attached | See Attached |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, California | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date July 14, 2009

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

CV-71 (05/08)　　　　　　　CIVIL COVER SHEET　　　　　　　Page 2 of 2

**Plaintiffs**

| | |
|---|---|
| Patricia C. Reiter | Kentucky |
| Christopher J. Reiter | Ohio |
| James A. Singler | Kentucky |
| Jack L. Reiter | |
| Patricia C. Reiter Irrevocable Trust | |
| Singler Trustee | Florida |

**Defendant's**

| | |
|---|---|
| Mutual Credit Corporation | Irvine, Orange County, California |
| Spurling Group, LLC | Delaware Corp., Wisconsin |
| Spurling Group II, LLC | Delaware Corp., Wisconsin |
| Michael Brown | Orange County, California |
| Anthony Jacobson | Orange County, California |
| David Doten | Orange County, California |
| Rumson Captial, L.P. | Pennsylvania |
| National Wealth Advisors | Florida |
| Richard L. Swope | Florida |
| Swope Lamberson, P.A. | Florida |
| Todd Shelbaugh | Florida |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Andrew Guilford and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV09- 811 AG (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

PATRICIA C. REITER, an individual
(see Attachment A for additional plaintiffs)

PLAINTIFF(S)

v.

MUTUAL CREDIT CORPORATION,
(see Attachment B for additional defendants)

DEFENDANT(S).

CASE NUMBER

**SACV09 -811 AG (RNBx)**

SUMMONS

**FOR OFFICE USE ONLY**

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Stephen R. Basser_____, whose address is _600 West Broadway, Suite 900, San Diego, CA 92101_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

JUL 1 4 2009

Dated: _____

Clerk, U.S. District Court

DODJE ~~SARGANTOS~~

By _____

Deputy Clerk

*(Seal of the Court)*

**FOR OFFICE USE ONLY**

SEAL

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

ATTACHMENT "A" TO SUMMONS
(additional Plaintiffs)

CHRISTOPHER J. REITER and JAMES A. SINGLER, as Successor Trustee of the Jack L. Reiter and Patricia C. Reiter Irrevocable Trust, U/A/D August 27, 2000,

PLAINTIFFS

ATTACHMENT "B" TO SUMMONS
(additional Defendants)

SPURLING GROUP, LLC, SPURLING GROUP II, LLC, MICHAEL BROWN, ANTHONY
JACOBSON, DAVID DOTEN, RUMSON CAPITAL, L.P., NATIONAL WEALTH
ADVISORS, RICHARD L. SWOPE, SWOPE LAMBERSON, P.A., TODD SHELBAUGH; and
DOES 1 through 100,

    DEFENDANTS.